UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JESSE W. MENDEZ,

    Petitioner,

  v.

GARY SWARTHOUT,

    Respondent.

Case No.  13-cv-02797-EMC (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I. **INTRODUCTION**

  Jesse W. Mendez filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent has filed an answer to the petition and Mr. Mendez has filed a traverse.  For the reasons discussed below, the Court denies the petition.

## II. **BACKGROUND**

A. Facts

  The California Court of Appeal summarized the evidence at trial:

> **Prosecution's Evidence**
>
> **The Shooting**
>
> Oakland Police Officer Kevin McDonald testified that, shortly after midnight on May 19, 2007, he was on traffic duty, riding his motorcycle in full uniform, in East Oakland on 77th Avenue near MacArthur Boulevard. McDonald saw an older style, yellow Camaro run a stop sign. He followed the Camaro, going northbound on 77th Avenue and then made a right turn onto McArthur Boulevard. McDonald observed two people in the front seat of the car. He turned on his red light, his flashing lights, and his siren.
>
> The Camaro eventually stopped, after making a right turn onto Parker Avenue from east-bound MacArthur. McDonald stopped his motorcycle behind the Camaro at the intersection of Parker and

United States District Court
For the Northern District of California

MacArthur. There were streetlights illuminating the area, including one directly overhead. McDonald got off his motorcycle and was having difficulty attempting to retrieve his flashlight from his duty belt. McDonald also paused to disconnect the wire running from his helmet to the motorcycle's radio.

When McDonald approached the Camaro, he saw the driver had turned so that his face was in the open driver's window and he was looking back at McDonald. The street lamp illuminated the driver's face. McDonald could see the silhouette of the passenger, but could not see what the passenger was doing. McDonald continued to watch the driver and fumble for his flashlight as he approached the vehicle. He did not see any movement from the passenger.

When McDonald arrived at the driver's door, and before he was able to ask the driver for his license and registration, McDonald heard two gunshots and saw muzzle flash in the driver's lap area. He did not see a hand or the gun. McDonald felt the first bullet strike him in the center of his chest, where it lodged in his protective vest. The second shot went through his left pinkie finger. The passenger was not in McDonald's view when he was shot. But, McDonald testified that he never saw the passenger lean forward, across the driver's body, or into the driver's seat.

After McDonald was shot, he began to retreat to the back of the vehicle, to put the vehicle between himself and the shooter. The driver was still looking out of the vehicle, but McDonald could not tell what the passenger was doing. McDonald testified: "It looked like the driver was raising his [right] arm up with the gun as I was retreating." McDonald heard two more shots fired and turned to duck. McDonald pulled out his service weapon, but by that time the Camaro was fleeing southbound down Parker. Eventually, McDonald lost sight of the Camaro.

McDonald radioed for help. He said he had been shot by a white male and gave a description of the Camaro and the direction it had headed. After other officers responded to the scene, an ambulance arrived and transported McDonald to the hospital. As a result of the shooting, McDonald suffered internal and external bruising to his chest and nerve damage to his hand. He continues to experience pain and suffers occasional nightmares. He was off work for three months after the shooting.

At trial, McDonald identified Mendez as the driver of the Camaro and the person who shot him. He also indicated that Mendez wore his hair in corn rows at the time of the shooting. He also testified that all of the shots fired came from the driver's side window and that none of the shots fired came from anywhere else in the vehicle. McDonald testified: "The only one that could have had a shot is the driver. If the passenger was leaning forward in order to get that shot, I would have seen that." McDonald was asked: "[A]re you certain that Mendez is the person who shot you?" He responded: "Yes, I am."

**The Police Investigation**

Oakland Police Officer Kevin Reynolds was also on traffic duty on May 19, 2007, in the vicinity of 77th Avenue and MacArthur Boulevard. Reynolds did not witness the shooting, but heard a series of two to three gunshots, a pause, and then another two to three gunshots coming from the area where he had seen McDonald make a traffic stop. Reynolds responded to the scene and found McDonald on the ground, just north of his motorcycle. McDonald told Reynolds that the shooter was "a male white driving a ′70's Chevy Camaro that was yellow [and] in poor condition...." McDonald advised Reynolds that the Camaro went south on Parker. Reynolds passed this information along to other officers in the area. Officers canvassed witnesses and set up a perimeter to contain the scene and the suspect.

An evidence technician also responded to the scene of the shooting, but recovered no bullet casings. One bullet slug was located on the sidewalk on the east side of Parker, next to the house at 7851 MacArthur Boulevard. A fragment of a bullet was found on the north side of MacArthur, to the east of Parker, in a gutter. A bullet hole was located in an exterior panel of a house at 7850 MacArthur, on the north side of MacArthur. A bullet was found inside the house. Another bullet slug was located inside the trauma plate of McDonald's protective vest.[4]

> Footnote 4:  Another officer, who had previously spoken with McDonald, told the technician that "when [McDonald] approached the vehicle the driver of the vehicle reached over his shoulder and shot four times.

An unoccupied vehicle matching McDonald's description was found two blocks south of the shooting scene, at Garfield and Parker. Mendez's identification card was found inside the glove compartment and turned over to Officer Pope. Four bullet casings were found on the driver's side of the car—three were found on the driver's side floorboard and another was found in the left-front door well.

A firearms expert examined the bullet fragments found at the scene and determined that they were all fired from the same gun. He also examined the casings and determined that they were all fired from the same gun. All of the bullets and casings were nine-millimeter and could not have been fired from a .22–caliber revolver. He determined that a Lorcin semi-automatic pistol was likely the firearm used. Casings are ejected from the right on such a gun. How the gun is held will, of course, impact where the casings end up. 2635 Parker was 1,237 feet from the scene of the shooting and close to the Garfield intersection.

Sergeant Barry Hofmann showed Mendez's identification card to McDonald at the hospital. Hofmann testified that McDonald looked at the card and said " 'Yeah, that's the guy.' " Hofmann then broadcast Mendez's name over the radio and gave a physical description, including the fact that he had long brown hair. McDonald did not recall being shown any other photographs of Mendez while he was at the hospital.

Oakland Police Sergeant Tony Jones testified that he was the primary investigator on the case. On May 19, 2007, between 4 and 5 a.m., Jones received information "that the officers had an informant, a citizen-informant, which essentially is a citizen who wants to remain anonymous but they want to give information, that saw the suspect hide underneath 2635 [Parker] after the shooting."[5]

> Footnote 5:  Jones did not have a name for the informant, but did receive a .22 caliber revolver from him.  Jones testified: "He was given my number by Sergeant Wingate and he called me. . . .  I figured if we ever needed him, Wingate could just call him.  But the person didn't want to get involved.  There isn't much I could do if a person doesn't want to get involved like that."

Police located Jeremiah Dye under the house. Dye was ultimately shot and killed by an Oakland police officer.  [Footnote omitted.] Dye had long hair that was slicked back on the sides and pulled back in a ponytail. Jones could not remember whether a gunshot residue test taken from Dye had been analyzed.

Jones testified that, at the time the informant's report was received, he already had Mendez's name from the identification found in the car. Although Mendez was identified as the suspect on May 19, he was not arrested until approximately two weeks later, in Sacramento. Mendez's head had been shaved.

On direct examination by the prosecutor, Jones was asked: "[I]n this particular case did you receive any information or leads that pointed to anyone else as the suspect in this case other than Mendez?" He was also asked "And are you aware of any physical evidence that points in any direction other than to Mendez as a suspect in this case?" Jones responded "No" to both questions.

**Independent Identification**

Tomeka Harper testified that, on May 19, 2007, a little after midnight, she was driving on Parker towards MacArthur. When she stopped at the intersection she saw a police officer on a motorcycle pulling over a yellow Camaro. She saw two people in the front seat of the car. She described the driver as follows: "He lookeded [sic ] like he was mixed. It looked like he had long hair. It was pulled back in a ponytail, and he had on like a ... gray, black and white like camouflage jacket."[7] Harper said the driver was not wearing his hair in dreadlocks or corn rows but rather, had it "slicked back" [on] the side of his head. At trial, Harper identified Mendez as the driver of the Camaro. She remembered the intersection being well-lit. She had not been drinking that night and was paying close attention because she "was being nosy."

> Footnote 7:  A black, white, and gray sweatshirt was found in the Camaro.

After Harper turned right onto MacArthur, she lost sight of the Camaro and the officer. She stopped at a liquor store about a block away and then heard gunshots. She drove her car back to Parker and

United States District Court
For the Northern District of California

MacArthur, parked her car, and gave a statement to police. Later, Harper was driven by police to the Camaro parked on Garfield. She identified it as the same car she saw the officer stop. She also identified Mendez, as the driver of the Camaro, from a photographic lineup. She did not see the passenger as well, but testified that he may have been wearing a white t-shirt and "could have been mixed race or white."

**Testimony of Andre Stovall**

Andre Stovall testified that he has known Mendez for "some years ." He said that during the late evening of May 18, 2007, and early morning of May 19, 2007, Stovall was drinking with friends around 72nd Avenue. Mendez arrived, in "an older model car ... [¶] ... [¶][w]ith some Mexican dude" who may have been Mendez's cousin. Both Mendez and his cousin wore their hair slicked back and in ponytails. They all were "hanging out" and drinking "most likely tequila."

Stovall testified: "I had a gun and I showed it to [Mendez], you feel me? And his cousin, or whoever he was, had one and he showed it to me.... I looked at it and gave it back to him and he gave it back to his cousin." Stovall saw Mendez the next day. Mendez looked like he had his hair cut since Stovall saw him the night before. Mendez asked to use Stovall's phone and Stovall let him.

Stovall did not remember Mendez saying anything about shooting at police. Stovall conceded, however, that he had previously given a taped statement to police, on May 30, 2007. He testified, however, that he did not remember what he had told police. Stovall's taped police statement was played for the jury. On that taped statement, Stovall said Mendez was with the group on 72nd Avenue the evening before the shooting. Stovall saw someone hand a gun back to Mendez. Stovall said: "We was talkin' 'bout was [Mendez] really Caucasian. He a light Mexican." They said "that [Mendez] was a white boy. And he don't ever get pullt [sic ] over by the police cuz he a white boy." In response, Mendez said: "he'ud [sic ] get down— he said ... he'ud [sic ] shoot if the police pullt [sic ] him over." Stovall also told police that when he saw Mendez the following day, Mendez's hair was cut and Mendez said "he got pullt [sic ] over and he shot at the police."

On cross-examination, Stovall testified that he only made the above statement to police after they threatened to make a negative report to his parole officer. Stovall said: "I told [the police] some stuff they wanted to hear because I wanted to go home." Stovall testified that Mendez never said he had shot a police officer. However, he did not lie about Mendez getting a haircut.

Stovall conceded that it was not good to be known as a snitch in his neighborhood.

**Defense Evidence**

Joel Gay testified that he grew up in the same neighborhood as Mendez. On May 18, 2007, Gay had been on 72nd Avenue drinking

United States District Court

For the Northern District of California

and smoking marijuana with others. At one point, Mendez arrived and drank with the group. Gay testified that, after the shooting, about 20 Oakland police officers came to his house, handcuffed him, and took him in for questioning. Gay testified that he was threatened and coerced by police to make incriminating statements about Mendez. He said that the officers took three different statements from him, but only recorded the last one. Gay said that he first told officers that he had never seen Mendez with a gun because that was the truth. But, Gay said: "I was directly told to say that I saw Jesse with a gun." At trial, Gay said that Mendez never told him that he had shot an officer. Gay filed an internal affairs complaint regarding Sergeant Longmire.

On cross-examination, Gay testified that Mendez came by his house the day after the shooting. Mendez told Gay: "'Man, I'm kind of hot, man. I need you to do something for me. [¶] ... [¶] Let me get some money.'" Gay did not ask Mendez what he meant. But, he did give him "enough [money] to get a room." The prosecutor also played Gay's taped police statement for the jury. During the taped statement, Gay told officers that he had seen Mendez the night of the shooting, that Mendez had a gun, and that Mendez said he was going to shoot if he was pulled over by police. Gay also told police that Mendez came to his house the next day and said: " 'Soon as I got to 77th and Mac, a motorcycle come, whoooop! I pulled over—license and reg—PAH PAH PAH PAH POP.'"

Oakland Police Officer Lesa Leonis testified that she was on patrol, on May 19, 2007, and responded to Garfield and Parker. She testified that Officer Pope gave her a wallet-sized photograph of a male adult and a child. She and Officer Jiminez took the photo to the hospital and showed it to McDonald. McDonald was "unsure" whether the photograph showed the shooter. Leonis testified that she did not recognize anyone in court that was in the photograph. She remembered only that it showed a "light complected" male. She was not sure what happened to the photograph.[8]

> Footnote 8:  Jones did not recall ever seeing a photo of Mendez with a small child.

Officer John Fukuda and Officer Jamin Creed both testified that they responded to 2635 Parker, on May 19, 2007. While he was at 2635 Parker, Fukuda heard someone yell "'Oakland police, show me your hands,'" and then, within a matter of seconds, Fukuda heard a gunshot. Creed took a gunshot residue test sample from the body of Mr. Dye.

Sergeant James Rullamas was Jones's partner in the investigation of the shooting of McDonald. At approximately 5:00 a.m. on May 19, 2007, he responded to the 2600 block of Parker because of a report that "the suspect was in custody." When he arrived "the suspect [was] still on the ground" but was deceased. Jones was also present. Rullamas thought Dye's appearance was similar to the appearance of Mendez in a photograph.

The parties stipulated that Mendez had suffered a felony conviction in 1999.

**Closing Arguments**

In his closing argument, Mendez's trial counsel conceded that Mendez was driving the Camaro, but argued that the People had not proved, beyond a reasonable doubt, that he was the shooter. In support, Mendez's trial counsel pointed to the missing photograph of a man with a small child, the lighting conditions at the scene of the shooting, McDonald's preoccupation with his flashlight, and the physical location of the bullets and casings—in the hopes of discrediting McDonald's testimony and pointing the finger at the passenger. Mendez's trial counsel also argued, without objection: "[S]omeone said that they had seen the shooter exit the vehicle down on Parker. This is an anonymous informant.... [H]e also observed that person go underneath a house at 2635 Parker Avenue. And of course this raises the next major question in this case, and that is the obvious question, is the shooter under that house? Yes, he was. That was Mr. Dye." In rebuttal, the prosecutor responded: "Who came in here and said the dead guy under the house was even in the car? Not one person."

*People v. Mendez*, 2011 WL 6396513, at \*1-6 (Cal. Ct. App. Dec. 21, 2011) (footnotes omitted).

B.   Procedural History

Mr. Mendez was convicted in Alameda County Superior Court of attempted murder of a peace officer, possession of a firearm by a felon, and discharging a weapon from a motor vehicle. Sentence enhancement allegations for personal and intentional discharge of a firearm were found true.  On March 29, 2010, Mr. Mendez was sentenced to a term of life with the possibility of parole, plus 23 years in prison.

He appealed and sought habeas relief in the state courts.  The California Court of Appeal affirmed his conviction and denied his petition for writ of habeas corpus.  Docket Nos. 19-3 and 19-6.  The California Supreme Court summarily denied review on March 21, 2012, and summarily denied Mr. Mendez's petition for writ for habeas corpus on April 30, 2014.  *See* Docket Nos. 19-12.

Mr. Mendez filed this action for a writ of habeas corpus.  He alleged the following claims in his amended petition:  (1) his Sixth Amendment right to confrontation was violated when the court sustained an objection to a defense cross-examination question for sergeant Jones about an unidentified witness; (2) Mr. Mendez's Sixth Amendment right to confrontation was violated when the court excluded as hearsay a statement by sergeant Jones on a recording shown to the

United States District Court
For the Northern District of California

jury; (3) the prosecutor's failure to correct sergeant Jones' false testimony violated Mr. Mendez's Fourteenth Amendment right to a fair trial; (4) Mr. Mendez's Fourteenth Amendment right to due process was violated by the suppression of material evidence; (5) Mr. Mendez was denied his Sixth Amendment right to the effective assistance of counsel; and (6) the denial of a defense request for a continuance violated his federal constitutional rights to due process and compulsory process.

## III.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## IV.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

## V.    DISCUSSION

A.    The Citizen-Informant

Most of Mr. Mendez's claims are based on statements made by a citizen-informant who wanted to remain anonymous. Before turning to the habeas claims, some information about the citizen-informant is helpful.

Shortly after officer McDonald was shot, a citizen-informant called the police to provide information about the criminal episode. The citizen-informant did not provide his name, but did provide a cell number at which he could be reached. The citizen-informant arranged to meet with officers at a particular location; when officers went to that location, they could not find the citizen-informant and left without speaking to him. The citizen-informant called the police a second time, and made arrangements to meet with the police at a different location. Several officers went to meet him. The citizen-informant did not want to give his name and did not want to be involved with the investigation. When he met with the officers, the citizen-informant told them that he had seen the shooting and saw the shooter exit the car to hide under the house at 2635 Parker Avenue. That house was 1,237 feet (i.e., more than four football fields in length) from the scene of the shooting. The citizen-informant discussed a reward with the officers before providing the information. The information provided to the defense before trial was that no reward was agreed upon or paid; several years after trial the prosecutor disclosed during state habeas proceedings that a $5,000 reward had been paid to the informant.

The officers acted on the tip, surrounded the house at 2635 Parker, found Mr. Dye hiding under the house, and eventually one of the officers shot and killed Mr. Dye. Mr. Dye was shot within a few hours after officer McDonald was shot at 12:17 a.m.

9

**United States District Court**
For the Northern District of California

The citizen-informant was given a phone number for sergeant Jones, the lead investigator on the officer McDonald shooting.[1]  The citizen-informant made contact with sergeant Jones the next day and arranged to deliver a gun to him.  Sergeant Jones took an undercover car and met the citizen-informant on the street, where the informant gave him a gun that he allegedly had retrieved from the area where the shooter had hidden.  That gun turned out not to be the weapon from which the shots were fired at officer McDonald; apparently, the gun that fired the shots at officer McDonald was never recovered.

The identity of the citizen-informant remains unknown to the police and the defense. During discovery in state habeas proceedings, Mr. Mendez learned that a $5,000 reward had been paid to the citizen-informant (who remained anonymous), and the Oakland Police Department had no record of the name of the citizen-informant to whom the reward had been paid.

Defense counsel tried mightily to get before the jury the information that the citizen-informant had seen both the shooting and the shooter hide beneath the house.  Although the jury heard that Dye was a suspect and was found beneath the house, no evidence was admitted that the citizen-informant had seen the entire incident and saw the shooter hide under the house.

B.     Confrontation Clause Claims

1.     Background

Two particular portions of sergeant Jones' testimony form the basis for Mr. Mendez's Confrontation Clause claims.  The first portion is an exchange that occurred during the prosecutor's questioning of sergeant Jones, the lead investigator:

> Q: Okay.  Now, Sergeant, in this particular case did you receive any information or leads that pointed to anyone else as the suspect in this case other than Mr. Mendez?
>
> A:     No.

RT 664.  During cross-examination, defense counsel tried to elicit other-suspect information from sergeant Jones, but was unable to do so successfully:

---

[1] Sergeant Jones testified that there were two separate investigations: one for the shooting of officer McDonald, and another for the officer-involved shooting of Mr. Dye.

Q [BY DEFENSE COUNSEL]: Okay. And the information that you had that you acted upon when you -- strike that -- that the officers acted upon when they went to 2635 Parker Avenue was that of the observations of the person who indicated he had seen the shooting; is that correct?

A: Yes.

Q: And that person had advised the investigating officers that he had actually seen the person who had done the shooting go underneath that house?

MR. JAMES [PROSECUTOR]: I'm going to object as hearsay.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Your Honor, it shows that the police acted upon it as a result of that information. It shows why they did what they did.

THE COURT: Sustained, counsel.

RT 708. Defense counsel then moved on to other topics of cross-examination.

The second portion of the examination of sergeant Jones that gives rise to a Confrontation Clause claim is the trial court's redaction of one sentence uttered by sergeant Jones on a DVD that was created as part of the investigation into the shooting of Mr. Dye. The trial court "noted that it was particularly concerned with the following statement, by Jones, on the DVD: 'I'm told we were—the officers were led to this location by a witness that seen the entire incident and saw the suspect hide underneath this house here.'" *Mendez*, at *8. The following discussion occurred outside the presence of the jury:

[DEFENSE COUNSEL]: Actually, this is just a statement of what had been given to Jones by others there, and it goes to his, meaning Sergeant Jones's, state of mind in the course of this investigation as to the facts and circumstances of what was going on. And even if it is hearsay, [the] state of mind exception should resolve that. And also the fact that it's part of his investigation process as well as . . . if this is hearsay, all of this has actually been testified to by some witnesses in this case.

THE COURT: Well, I understand that witnesses may have testified to a lot of this stuff, but it's still hearsay. Why is his state of mind relevant?

[DEFENSE COUNSEL]: It's relevant as far as what he was doing by way of his investigation of the case."

RT 956-57. The trial court ordered Jones' statement redacted before the DVD was played for the

United States District Court
For the Northern District of California

11

**United States District Court**
For the Northern District of California

1  jury.

2      2.    <u>State Court Rejection Of Evidence Code And Confrontation Clause Claims</u>

3          Mr. Mendez argued on appeal that, by sustaining the hearsay objection and redacting the

4  sentence from the recording, the trial court violated his state law and Confrontation Clause rights

5  to present to the jury evidence that the informant had said he saw the shooting and saw the shooter

6  hide under the house.  The California Court of Appeal rejected the arguments that the exclusion of

7  the evidence was error under the California Evidence Code and that the exclusion of the evidence

8  violated Mr. Mendez's rights under the Sixth Amendment Confrontation Clause.

9          Mr. Mendez conceded on appeal "that the out-of-court statements were not admissible for

10  their implied truth, i.e., that the person found under the house on Parker Avenue (Dye) was the

11  person who shot McDonald," and instead had argued that the statements were offered for the

12  nonhearsay purpose of contradicting sergeant Jones' direct testimony to prove sergeant Jones'

13  knowledge about information about other suspects.  *Mendez*, at *8.  The state court of appeal was

14  concerned that the evidence was "double or even triple hearsay" because Jones was being asked to

15  testify to what the officers told him that the citizen-informant told them.

16          Focusing on the citizen-informant's statement to the police, the California Court of Appeal

17  explained that a hearsay objection to an out-of-court statement may not be overcome merely by

18  identifying a nonhearsay purpose; that nonhearsay purpose must be relevant to an issue in dispute

19  to overcome the hearsay objection.  *Id.*  The nonhearsay purpose identified at trial -- i.e., to show

20  why the police "did what they did" -- was irrelevant; "[t]here were no disputed issues with respect

21  to why police responded to 2635 Parker."  *Id.*  Mr. Mendez's new theory on appeal -- that the

22  evidence was admissible for the nonhearsay purpose of impeaching Jones' testimony that there

23  was no evidence or leads pointing to a suspect other than Mr. Mendez -- fared no better because

24  the argument had not been made at trial and, even if the argument had been made at trial, defense

25  counsel "did not make an adequate record that the out-of-court statement would, in fact, have

26  impeachment value."  *Id.*

27          The Court of Appeal also found that any assumed error was harmless.  "[E]ven if we

28  assume that the informant's out-of-court statement was as favorable as Mendez suggests and that

exclusion was error, there is no possibility that the trial court's evidentiary ruling prejudiced Mendez, regardless of whether error is judged under the state standard for erroneous evidentiary rulings, . . . or, as Mendez argues, under the standard required in assessing federal constitutional error.  (*Chapman v. California* (1967) 386 U.S. 18, 24; *Delaware v. Van Arsdall, supra,* 475 U.S. at p. 684.)"  *Mendez*, at *10.

> Reversal might be required if Mendez could establish some basis for admitting the informant's statement for the truth of the matter asserted. But, it is undisputed that the informant's out-of-court statement could not have been admitted for its truth. Thus, there is no way that any error in excluding the evidence for a limited purpose forestalled Mendez from presenting a defense. Jones did not witness the shooting. Jones's role, as the primary homicide investigator, was merely to summarize the evidence collected in the case. In addition to Jones's testimony that he was not aware of any evidence or leads pointing to a suspect other than Mendez, the jury also was presented with strong direct and circumstantial evidence that Mendez was the shooter.
>
> Mendez did not testify or present other direct evidence that Dye was the shooter. Instead, he asked the jury to speculate, from the lighting conditions, Officer McDonald's preoccupation with his flashlight, the fact that the passenger was, at times, out of Officer McDonald's view, the missing photograph, the location of the bullets and casings, and the unanalyzed gunshot residue kit that such was the case. Moreover, Jones's partner in the investigation, Rullamas, was called as a witness by the defense and testified, without objection, that Dye was a "suspect" in the shooting of Officer McDonald, and defense counsel was allowed to argue, without objection, that the anonymous informant actually saw the shooting, and saw the alleged shooter (inferentially Dye) go under the house on Parker Avenue. Even assuming that Dye was the passenger in the Camaro, we do not view this as a close case. Officer McDonald himself testified that he was certain that Mendez was the shooter.  Officer McDonald said that he saw the driver raise the gun as he retreated and never saw the passenger lean into the driver's seat. Another witness independently identified Mendez as the driver of the Camaro. Mendez's identification card was found inside the Camaro, where all of the casings were found on the driver's side. The firearms expert testified that none of the recovered bullets and casings could have been fired from the .22–caliber revolver obtained from the anonymous informant. Finally, it was undisputed that Mendez left the area and cut his hair after the shooting. There is no reasonable likelihood that the jury would have rejected all of this evidence if the out-of-court statements had been admitted for the limited purpose of impeaching Jones.

*Mendez*, at *10.

**United States District Court**
For the Northern District of California

3.    <u>Analysis</u>

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).  Trial judges retain wide latitude to impose reasonable limits on cross-examinations based on concerns about, among other things, "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  A defendant "can prove a violation of his Sixth Amendment rights by 'showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009) (omission in original) (quoting *Van Arsdall*, 475 U.S. at 680).  A showing of constitutional error under the Confrontation Clause only merits habeas relief if the error was prejudicial, that is, if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 1100 (9th Cir. 2009) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The California Court of Appeal correctly identified *Van Arsdall*, 475 U.S. 673), as providing the governing law on the Confrontation Clause claim, and quoted the relevant portions of the *Van Arsdall* case, including the *Chapman* harmless error analysis, to apply to such a claim. *Mendez*, at *7; *see Van Arsdall*, 475 U.S. at 684 (citing *Chapman v. California*, 386 U.S. 18, 22 (1967)).  The state appellate court reasonably applied *Van Arsdall*.

The California Court of Appeal's determination that there was neither a Confrontation Clause nor California Evidence Code violation because the evidence was properly excluded due to its minimal or nonexistent relevance was not an unreasonable application of *Van Arsdall,* which itself accords trial judges "wide latitude" to impose reasonable limits on cross-examination based on concerns about questioning "that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; *see, e.g., Plascencia v. Alameida*, 467 F.3d 1190, 1201 (9th Cir. 2006) (exclusion of cross-examination that would have provided cumulative or repetitive evidence did not violate

14

1    Confrontation Clause or was harmless error); *United States v. Sua*, 307 F.3d 1150, 1153 (9th Cir.

2    2002) (Confrontation Clause not violated by exclusion of codefendant's guilty plea with dismissal

3    of a charge when offered by defendant to establish government's belief in the codefendant's

4    innocence (and, by inference, in defendant's innocence) based on dismissal of that charge because

5    potential jury confusion and undue delay outweighed defendant's interest in presenting the

6    marginally relevant evidence); *Bright v. Shimoda*, 819 F.2d 227, 229-30 (9th Cir. 1987) (no

7    constitutional violation where substantial cross-examination permitted and excluded evidence was

8    of collateral nature); *Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir. 1982) (Confrontation Clause

9    satisfied where trial judge restricted cross-examination of key witnesses as to drug use where

10   evidence of such use was already before jury).  Evidence about sergeant Jones' state of mind was

11   not relevant, or was at most only marginally relevant, to any issue properly in dispute at Mr.

12   Mendez's trial.

13        Mr. Mendez's real interest was in getting the jury to hear that a witness said he saw the

14   shooting and saw the shooter hide under the house because that would suggest that Mr. Dye rather

15   than Mr. Mendez was the shooter.  Mr. Mendez's efforts to conjure up nonhearsay purposes to get

16   that information before the jury do not overcome the hearsay problem in that evidence because, as

17   the California Court of Appeal explained, it is not enough to articulate a nonhearsay purpose when

18   that nonhearsay purpose is not relevant.  This is not a case where, *e.g.*, the trial court excluded

19   non-hearsay direct testimony of a witness who would have provided exculpatory testimony.  The

20   testimony sought here from sergeant Jones was instead double hearsay.

21        The defense was allowed to cross-examine sergeant Jones extensively (*see* RT 665-88,

22   692-715, 720-28) and even called him as a witness for the defense (*see* RT 962-71).  Defense

23   counsel cross-examined sergeant Jones about the scene where the shooting of officer McDonald

24   took place, police activities at the house on Parker Avenue, and the course of the investigation.

25   The cross-examination of sergeant Jones by defense counsel covered Mr. Dye and the informant,

26   even if sergeant Jones did not relay that the informant said he had seen Dye shoot officer

27   McDonald.  Sergeant Jones agreed with the statement that he had "received some information

28   from some officers who provided [him] some information given by citizen-informants."  RT 676.

Sergeant Jones further testified:  "The information that I received was that the officers had an informant, a citizen-informant, which essentially is a citizen who wants to remain anonymous but they want to give information, that saw the suspect hide underneath 2635 after the shooting."  RT 676-77.  Sergeant Jones also testified that he learned that a possible suspect was under the house at 2635 Parker between 4:00 a.m. and 5:00 a.m.  RT 679.  Sergeant Jones also testified that he "had information that sergeant Wingate, who was in charge of the Target Enforcement Task Force, was working with someone and had information, but I didn't get the specifics because I had witnesses and people downtown that I needed to talk to."  RT 679.  Sergeant Jones further testified that he received a weapon from the informant the next day:  "The same person who had reported to Wingate that they had saw the person go under the house, I met that person.  I was in an undercover car.  I pulled up on the person and the person handed me a plastic bag with a revolver in it."  RT 680; *see also* RT 681-82 (on May 20, sergeant Jones obtained the weapon from "[t]he person who was providing information to sergeant Wingate and his officers throughout this incident"); *see also* RT 684 ("That's what I said earlier, we had an officer involved shooting.  The suspect was underneath the house").  The defense showed a videotape of sergeant Jones at 2635 Parker after the shooting.  RT 962.

The California Court of Appeal also determined that the exclusion of the evidence, if error, was harmless under the "state standard for erroneous evidentiary rulings" and under the *Chapman* standard for assessing federal constitutional error.  *Mendez*, at *10.  Because the state appellate court rejected the claim under the *Chapman* standard, this Court "may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable."  *Davis v. Ayala*, 135 S. Ct. 2187,  2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007)).  "And a state-court decision is not unreasonable if 'fairminded jurists could disagree' on [its] correctness."  *Id.* (alteration in original).

The California Court of Appeal's determination that any Confrontation Clause error was harmless was not unreasonable.  As the state appellate court explained, sergeant Jones did not witness the shooting and was merely summarizing the evidence collected.  There also was "strong direct and circumstantial evidence that Mendez was the shooter."  *Mendez*, at *10.  Officer

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

McDonald was certain that he was shot by the driver, had seen the driver raise his arm with the gun in it after the first two shots, and was firm in his identification of Mr. Mendez as the driver and as the shooter.  Mr. Mendez had not testified or presented other direct evidence that Mr. Dye was the shooter, and asked the jury to speculate from various circumstances that Mr. Dye was the shooter.  Further, evidence *was* admitted that Mr. Dye was a suspect in the shooting and had been shot under the house on Parker Avenue.  Defense counsel was able to argue that the citizen-informant saw the shooting and saw the shooter hide under the house on Parker Avenue.   Mr. Mendez is not entitled to relief on his Confrontation Clause claims because the state appellate court's determination that there was no error and any assumed error would have been harmless was not contrary to, or an unreasonable application of, any holding of the U.S. Supreme Court.

C.      *Napue* Claim

1.      Background

Mr. Mendez contends that his right to due process was violated because sergeant Jones provided false testimony and the prosecutor allowed it to go uncorrected.   The following testimony, which is part of the same evidence that gave rise to the Confrontation Clause claims discussed above, forms the basis for the *Napue* claim:

> "Q: Okay.  Now, Sergeant, in this particular case did you receive any information or leads that pointed to anyone else as the suspect in this case other than Mr. Mendez?
>
> A:      No.

RT 664.  Mr. Mendez argues that the statement "was undeniably false" because sergeant Jones had testified at the preliminary hearing that sergeant Wingate had told him that the citizen-informant had told sergeant Wingate that the witness had seen officer McDonald get shot, and had seen the person who had shot him go into the yard where officers found Mr. Dye under the house.  Docket No. 7 at 29.  Mr. Mendez argues that the problem was exacerbated when, on cross-examination, defense counsel tried to rectify the false testimony by asking sergeant Jones, "[a]nd that person had advised the investigating officers that he had actually seen the person who had done the shooting go underneath the house?" but the sergeant did not answer because the prosecutor

17

**United States District Court**
For the Northern District of California

1    interposed a successful hearsay objection.  RT 708; *see* Docket No. 7 at 30.  Mr. Mendez points

2    out that the prosecutor argued repeatedly in rebuttal that there was no evidence whatsoever that

3    anybody but petitioner fired the shots at Officer McDonald.  Docket No. 7 at 32-33 (citing RT

4    1120, 1121, 1125-26).

5         The California Supreme Court rejected the *Napue* claim on the merits in a summary denial

6    of Mr. Mendez's habeas petition.  There is no reasoned decision from the state court on the *Napue*

7    claim.  The California Court of Appeal did discuss sergeant Jones' testimony, *see* Section B.2,

8    above, but did so in an analysis of claims that the trial court had erred in excluding the evidence on

9    hearsay grounds and in violation of Mr. Mendez's Confrontation Clause rights.  The *Napue* claim

10   was not presented to or decided by the California Court of Appeal.  This Court therefore applies §

11   2254(d) to the California Supreme Court's summary rejection of the *Napue* claim.

12        This Court "must determine what arguments or theories supported or . . . could have

13   supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

14   could disagree that those arguments or theories are inconsistent with the holding a prior decision

15   of [the U.S. Supreme] Court."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

16        2.   Analysis

17        A fundamental principle guiding the conduct of the prosecutor, as the representative of a

18   sovereign in this country, is "not that it shall win a case, but that justice shall be done."  *Berger v.

19   United States*, 295 U.S. 78, 88 (1935).  From this principle flow the rules that the prosecutor may

20   not hide evidence and may not let false evidence go uncorrected at trial.  *Cf. Strickler v. Greene*,

21   527 U.S. 263, 280-82 (1999).  When a prosecutor obtains a conviction by the use of testimony

22   which he knows or should know is perjured, the conviction must be set aside if there is any

23   reasonable likelihood that the testimony could have affected the judgment of the jury.  *See United

24   States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (same result

25   obtains when State, although not soliciting false evidence, allows it to go uncorrected when it

26   appears).  This principle applies to matters of witness credibility as well as direct evidence of guilt.

27   *See Napue*, 360 U.S. at 269.  To prevail on a claim of prosecutorial misconduct for use of false

28   witness testimony, a petitioner must show that (1) the testimony was actually false, (2) the

**United States District Court**
For the Northern District of California

prosecution knew or should have known that the testimony was false, and (3) the false testimony was material. *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue*, 360 U.S. at 269-71); *see also Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (prosecutor's action in presenting false evidence to the jury and by failing to correct the record violated petitioner's rights).

For a *Napue* claim, false testimony is material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States. v. Agurs*, 427 U.S. 97, 103 (1976). "This materiality standard is, in effect, a form of harmless error review, but a far lesser showing of harm is required under *Napue*'s materiality standard than under ordinary harmless error review. *Napue* requires [the court] to determine only whether the error *could* have affected the judgment of the jury, whereas ordinary harmless error review requires [the court] to determine whether the error *would* have done so." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) (citations omitted).

Like Respondent, this Court focuses on materiality and assumes for purposes of argument that sergeant Jones' statement that he did not receive any information that pointed to another suspect was false and that the prosecution knew or should have known of the falsity.

The California Supreme Court reasonably could have concluded that there was no "reasonable likelihood that the false testimony could have affected the judgment of the jury," *United States v. Agurs*, 427 U.S. 97, 103 (1976), and rejected the claim on that basis. Such a conclusion would have been reasonable because the jury knew from other evidence (especially sergeant Jones' own testimony) as well as from defense counsel's closing argument the same information that the jury would have learned had the prosecutor corrected the misstatement by sergeant Jones. *See Soto v. Ryan*, 760 F.3d 947, 961 (9th Cir. 2014) (state court's denial of *Napue* claim was not unreasonable because evidence that allegedly revealed the deception "was in fact disclosed to the jury during trial"); *id.* at 968-69 & n.10 (the evidence not disclosed "was not independently significant to or probative of [defendant's] guilt").

At Mr. Mendez's trial, the jury had heard testimony that there was a second person in the car with Mr. Mendez, that there was an informant who directed the police to the house on Parker

**United States District Court**
For the Northern District of California

Avenue, that Mr. Dye had been considered a suspect, and that Mr. Dye had been shot and killed by the police at the house on Parker Avenue within hours of the shooting of officer McDonald.  Much of the information came from sergeant Jones himself.  During his testimony, sergeant Jones agreed with the statement that he had "received some information from some officers who provided [him] some information given by citizen-informants."  RT 676.  Sergeant Jones further testified:  "The information that I received was that the officers had an informant, a citizen-informant, which essentially is a citizen who wants to remain anonymous but they want to give information, that saw the suspect hide underneath 2635 after the shooting."  RT 676-77.  Sergeant Jones also testified that he learned that a possible suspect was under the house at 2635 Parker between 4:00 a.m. and 5:00 a.m.  RT 679.  Sergeant Jones also testified that he "had information that sergeant Wingate, who was in charge of the Target Enforcement Task Force, was working with someone and had information, but I didn't get the specifics because I had witnesses and people downtown that I needed to talk to."  RT 679.  Sergeant Jones further testified that he received a weapon from the informant the next day:  "The same person who had reported to Wingate that they had saw the person go under the house, I met that person.  I was in an undercover car.  I pulled up on the person and the person handed me a plastic bag with a revolver in it."  RT 680; *see also* RT 681 (he obtained the weapon from "[t]he person who was providing information to Sergeant Wingate and his officers throughout this incident."); RT 684 ("That's what I said earlier, we had an officer involved shooting.  The suspect was underneath the house.").  The defense even showed a videotape of sergeant Jones at 2635 Parker after the shooting.  RT 962.  Whatever caused sergeant Jones to make the misstatement that forms the basis of the *Napue* claim, a jury listening to his testimony overall certainly would have understood that there was another suspect and he was aware of the existence of another suspect.[2]

During closing argument, defense counsel argued to the jury that reasonable doubt existed based on the informant's statements and Mr. Dye's conduct.  RT 1113-14.

---

[2] Sergeant Rullamas, sergeant Jones' partner, also testified that there was another suspect, who had been shot and killed, RT 986-87, and that suspect who had been shot and killed at 2635 Parker was a suspect "in the shooting of the officer."  RT 997.

United States District Court
For the Northern District of California

1

2       Then the scene changes a little bit, and we wound up with some
        investigation that was going on that evening because someone said

3       that they had seen the shooter exit the vehicle down on Parker. This
        is an anonymous informant. And that led of course to the

4       investigating officers to go down on Parker and to begin looking for
        the suspect. That informant had also indicated that he had heard a

5       metal sound hit the ground. And in going down there -- then the
        informant advised that not only had he observed the person who had

6       done the shooting exit the vehicle, he also observed that person go
        underneath a house at 2635 Parker Avenue. And of course this

7       raises the next major question in this case, and that is the obvious
        question, is the shooter under that house? Yes, he was. That was

8       Mr. Dye. And how do you know that and what are the factors that
        would cause you to want to believe that it was in fact Mr. Dye who

9       did the shooting and Mr. Dye who was in fact attempting to [elude]
        arrest just as it has been suggested the Mr. Mendez did?

10      Number one, he is the person that the informant observed exit the
        vehicle and go into that crawl space underneath that house.

11

12      Number two, once the police have found that there is a suspect
        underneath the house at 2635 Parker, they. . . . bring in the SWAT

13      squad so that they can extricate this person from underneath the
        house.

14   RT 1113-14. Defense counsel further argued that Mr. Dye's flight and concealment under the

15   house showed Dye's consciousness of guilt. RT 1114. Defense counsel also argued that "the

16   trajectory of the bullets and the . . . conduct of Dye after the shooting" was at least as consistent

17   with Mr. Dye being the shooter as with Mr. Mendez being the shooter. RT 1117.[3]

18         The critical question in the case was the identity of the shooter, and sergeant Jones'

19   testimony was not particularly important on that point because he was not a percipient witness.

20   Officer McDonald had positively identified Mr. Mendez as the person who shot him. A

21   bystander, Ms. Harper, who heard the shooting, identified Mr. Mendez as the driver of the car.

22   _____

23         [3] After emphasizing Mr. Dye as a suspect and the likely shooter (see RT 1113-1120),
     defense counsel ended his closing argument with an argument that the prosecutor should in

24   rebuttal "be telling you wherein and how in he proved beyond a reasonable doubt that the shooter
     in this case was Jesse Mendez in view of the conflicts" in the evidence. RT 1119. "He should try

25   to explain those things to you how he in fact proved his case beyond a reasonable doubt
     notwithstanding all those factors." RT 1120. The prosecutor then began his closing argument

26   with a response to the challenge: "Well, let me tell you how I proved it. Only one person came in
     here and told you exactly what happened. His name was officer Kevin McDonald." RT 1120.

27   After describing officer McDonald's statements, the prosecutor argued that "[t]here is nothing, not
     one piece of evidence, not anything anybody in this case says anything to the contrary." Id. Later

28   in his rebuttal, the prosecutor stated that no one had testified that "the dead guy under the
     house . . . was even in the car." RT 1121.

United States District Court
For the Northern District of California

1    Having it pointed out for the jury that sergeant Jones was wrong when he testified that he had not

2    received any information or leads that pointed to anyone else as a suspect could have been another

3    illustration of the carelessness of the police, but that does not show any reasonable likelihood that

4    the false testimony could have affected the judgment of the jury as to Mr. Mendez's guilt.  The

5    jury already had plenty of other information on which to base an opinion that this was a shoddy

6    investigation by the Oakland Police Department, e.g., the police had lost a photo of Mr. Mendez

7    that was shown to Officer McDonald at the hospital to identify the shooter, the police had not

8    tested Mr. Dye's hands for gunshot residue, and the police had not tested the jacket that Mr.

9    Mendez allegedly had worn for gunshot residue.  RT 1115-16.  Defense counsel argued that, once

10   the police made the decision that Mr. Mendez was the shooter, "they dropped the ball" and

11   "stopped doing any further investigation."  RT 1116.

12       The case against Mr. Mendez was strong, and rested on eyewitness testimony from the

13   victim of the shooting who had been within a few feet of Mr. Mendez.  Mr. Mendez had changed

14   his appearance and fled the area promptly after the shooting.  Mr. Mendez's defense depended

15   largely on speculation "from the lighting conditions, McDonald's preoccupation with his

16   flashlight, the fact that the passenger was, at times, out of McDonald's view, the missing

17   photograph, the location of the bullets and casings, and the unanalyzed gunshot residue kit."

18   *Mendez*, at *10.  A fairminded jurist could reasonably have concluded that there was no

19   deprivation of due process or violation of *Napue* because the false testimony was not material,

20   given that the correct information was presented to the jury in other testimony, the witness who

21   made the misstatement was not a percipient witness to the shooting of officer McDonald or to the

22   events at the house on Parker Avenue.

23       Mr. Mendez argues that the prosecution's case "lacked persuasiveness" and "depended

24   entirely on McDonald's belief that the driver shot him even though McDonald did not see who

25   held the gun that fired from the driver's lap area while he could not see the passenger."  Docket

26   No. 7 at 30.  Despite Mr. Mendez's suggestion to the contrary, officer McDonald was very certain

27   in his testimony that Mr. Mendez shot him.  Officer McDonald explained that his training taught

28   him to notice everything; although he could see out of the corner of his eye that the passenger was

**United States District Court**
For the Northern District of California

not moving, he kept his focus on Mr. Mendez.  He also testified that he was able to see Mr. Mendez:  (1) the lighting was sufficient because, while it was midnight, there was a streetlight across the street that illuminated Mr. Mendez's face; (2) Mr. Mendez was in the driver's seat and had turned around in his seat so that he was looking at officer McDonald (and vice versa) as Officer McDonald approached the car; and (3) officer McDonald was a foot from the car at the post behind the driver's door when shot.  Officer Mr. Mendez was emphatic that Mr. Mendez rather than the passenger shot him:  (1) the muzzle flash at the end of the barrel that accompanies a gunshot came from Mr. Mendez's lower lap area; (2) Officer McDonald saw no movement by the passenger; (3) Officer McDonald saw the gun in Mr. Mendez's hand as Mr. Mendez raised his arm up to fire the third and fourth shots; (4) Officer McDonald did not see the passenger leaning forward to reach toward the driver's lap area, even though he did not see the passenger for 4-5 seconds when the shooting was going on; and (5) Officer McDonald instinctively tried to run behind the car and toward the passenger's side when the shooting started, which he would not have done if he thought the passenger was the shooter.  Further, contrary to Mr. Mendez's assertion in his amended petition, Officer McDonald did not testify on the cited pages that "he saw the arm *reach out of the window* with the gun to fire two more shots at him."  Docket No. 7 at 31 (emphasis added).

Mr. Mendez argues that the false evidence problem was exacerbated by the prosecutor's objection on cross-examination.  On cross-examination, sergeant Jones answered in the affirmative to the question whether the information "that the officers acted upon when they went to 2635 Parker Avenue was that of the observations of the person who indicated he had seen the shooting."  RT 708.  The prosecutor did *not* object to that question and only objected when defense counsel tried to elicit the hearsay evidence with the follow-up question,  "And that person had advised the investigating officers that he had actually seen the person who had done the shooting go underneath that house?"  RT 708.  Mr. Mendez's argument that the prosecutor improperly interposed a hearsay objection to defense counsel's inquiry on cross-examination fails to persuade the Court.  "The California Supreme Court reasonably could have concluded that there was no reasonable likelihood that the judgment of the jury would have been affected if, instead of

an objection, sergeant Jones had answered the question in the affirmative and said that the informant had told an investigator that he saw the person who did the shooting go under the house."

Therefore, Mr. Mendez is not entitled to the writ on his *Napue* claim.

D.    Brady Claim

1.    Background

Mr. Mendez claims that the suppression of some evidence related to the citizen-informant violated his rights under *Brady v. Maryland,* 373 U.S. 83 (1963).  The suppressed evidence consisted of (1) a recording made surreptitiously by sergeant Jones of his meeting with the citizen-informant on May 20 when sergeant Jones received a gun from the citizen-informant; and (2) the audio recordings of "interviews of Sergeants Wingate and Mork and officer Roche, in which they describe[d] their joint interview with the two witnesses, one of whom told them he saw Officer McDonald be shot and saw the shooter hide under the house where officers found and killed Dye." Docket No. 4 at 14.  These materials were not provided to the defense until the state habeas proceedings.  Docket No. 7 at 24.

Mr. Mendez argues that the suppressed evidence was material in two ways.  First, the evidence might have enabled defense counsel to find the citizen-informant.  Second, the evidence might have bolstered defense efforts to get the citizen-informant's statement (i.e., that he saw the shooting and saw the shooter hide under the house on Parker Avenue) admitted as a spontaneous statement.  According to Mr. Mendez, the suppressed information "revealed to the defense for the first time that Sergeant Wingate had paid a reward to the witness at the time he told them where to find the shooter."  Docket No. 4 at 14.

The California Supreme Court rejected the *Brady* claim on the merits in a summary denial of Mr. Mendez's habeas petition, *see* Docket No. 19-12, and no lower state court issued a reasoned decision on the *Brady* claim.  This Court therefore applies § 2254(d) to the California Supreme Court's summary rejection of the *Brady* claim.  Because the claim was rejected by the California Supreme Court without explanation, this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is

possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

       2.   <u>Analysis</u>

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. For a *Brady* claim to succeed, a petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued). *See Banks v. Dretke*, 540 U.S. 668, 691 (2004).

The first prong of a *Brady* claim is satisfied. "[W]hether evidence is favorable is a question of substance, not degree, and evidence that has any affirmative, evidentiary support for the defendant's case or any impeachment value is, by definition, favorable." *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). The recordings were favorable to Mr. Mendez because they were both exculpatory and impeaching. If believed, the citizen-informant's statement mentioned in the recordings of the interviews of the officers was exculpatory in that it pointed to Mr. Dye as the shooter. The recordings also had impeachment value because they contradicted the police officers' testimony that no reward had been paid and sergeant Jones' testimony that he received no information pointing to other suspects.

The second prong of a *Brady* claim is satisfied because the recordings were suppressed and were not produced until after the trial. The explanation from the district attorney's office was that the items had been overlooked because they were located in the Oakland Police Department's Internal Affairs file for the officer-involved shooting of Mr. Dye rather than in the investigative file for the shooting of officer McDonald. *Brady* has no good faith or inadvertence defense; whether the nondisclosure was negligent or by design, it is the responsibility of the prosecutor to turn over the materials, *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004), including materials

1    known only to the police, *see Phillips v. Ornoski*, 673 F.3d 1168, 1186-87 (9th Cir. 2012).

2            Mr. Mendez's claim falters at the third, or materiality, prong of a *Brady* claim.

3            Evidence is material under *Brady* "when there is a reasonable probability that, had the

4    evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*,

5    556 U.S. 449, 470 (2009).   Mere speculation that suppressed evidence might have changed the

6    trial is not enough to satisfy the materiality element of a *Brady* claim.  *See Wood v. Bartholomew*,

7    516 U.S. 1 (1995); *Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005) ("'The mere

8    possibility that an item of undisclosed information might have helped the defense, or might have

9    affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.'")

10   The issue under AEDPA is whether the California Supreme Court could reasonably have found

11   the evidence was not material.  Several reasons could have supported a determination by the

12   California Supreme Court that the suppressed evidence was not material.  First and foremost, the

13   defense knew almost all of the substance of the information in the recordings from other

14   disclosures made before trial.[4]  *See Rhoades v. Henry,* 638 F.3d 1027, 1038-39 (9th Cir. 2011) (no

---

[4] Defense counsel had received several important items.

Before trial, counsel had received sergeant Jones' report which had a chronology of events showing, among other things, that he had met with the citizen-informant and surreptitiously recorded his meeting with the citizen-informant on May 20, where the citizen-informant gave him a gun and "said the suspects were throwing guns out of the vehicle as they drove down Parker Street."  Docket No. 19-9 at 35.  That written report did not state that the citizen-informant had indicated a reward had been paid, whereas the recording disclosed after trial apparently included the citizen-informant making reference to having received a reward.

Counsel also had received before trial "a copy of the recorded interview of Sergeant Romans," who was one of the officers at the meeting with the citizen-informant on the night of the shooting when he gave his statement to the police. *Id.* at 19, 49.

Counsel also had received before trial the handwritten notes, but not the audio recordings, of the interviews of officer Roche and sergeant Mork, who also were present at the meeting with the citizen-informant.  *Id.* at 49.  The notes of the interview of officer Roche, apparently written by sergeant Pullamas are found at pages 75-80 of Docket # 19-9.  Some of the handwritten notes are hard to read, but I think some parts of the note state the following: (1) radio dispatch relayed that someone saw the shooting and knew where suspect was; Roche and [illegible] went to the address but no one was there; (2) when Roche and [illegible - Romans? Ramos?] got back to command post, dispatch reported that the person would meet them at a McDonald's restaurant; (3) Roche

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

disclosure violation where one of three reports pertaining to the same confession was turned over and the reports not turned over added no details not apparent or available from the other sources); C*oe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) ("There is no *Brady* violation 'where a defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory information," or where the evidence is available ... from another source,' because in such cases there is really nothing for the government to disclose.").  The citizen-informant's statement had been disclosed to defense counsel, and defense counsel tried to make use of it at trial.  The fact that the citizen-informant wanted a reward for his information also was disclosed to defense counsel, although the information given to defense counsel was that the officers did not actually pay a reward, whereas the suppressed evidence showed that a sizeable reward had been paid to the citizen-informant, who remained anonymous.

Second, the reward information would have made it less likely, rather than more likely, that the citizen-informant's full statement would have been admitted under the spontaneous statement exception to the hearsay rule.[5]  With regard to the hearsay problem presented by the

---

and others met with the informant, who "said he saw whole incident. Saw car [?] go onto Garfield. Saw where [illegible] got out of car.  Saw him throw something--possibly gun-- saw him go into crawl space of house and gave us exact address.  He asked for money.  He provided his cell number for us to call him."  Docket No. 19-9 at 77; (4) "Wingate, me, sgt. Mork, sgt. Ramons met w/ the caller.  He had a friend who was with him.  His main concern was money & animosity [sic].  Agreed on $5,000 for info.  I could hear clearly what they were saying," and the informant said the suspect went southbound on Parker, "saw him get out of car and throw something and then hide under the house," *id.*at 78; and (5) officer Roche described his role in trying to apprehend the suspect under the house.

Before trial, counsel may have been provided the notes from the interview of sergeant Wingate.  The district attorney stated that defense counsel was provided a copy of handwritten notes, but not the audio recording, of the interview of sergeant Wingate before trial; and trial counsel stated in his declaration that if a "copy of Sergeant Wingate's recorded" interview was provided, he "[did] not know why it is not in [his] file."  *Compare* Docket No. 19-9 at 50 *with id.*at 19.

Before trial, defense counsel was provided with the cell phone number that the citizen-informant had given to police.  *Id.* at 19.

[5] California Evidence Code § 1240 provides the State's hearsay exception for spontaneous statements:  "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by

**United States District Court**
For the Northern District of California

1   informant's statement, defense counsel already knew the statement was made shortly after the

2   shooting and that the witness appeared to be shocked, but not so shocked that he could not call the

3   police twice to arrange a meeting and request anonymity because of a fear of retaliation, and

4   ultimately ask for a reward.  The new evidence that a reward had been paid would have not made

5   the informant's statement any more spontaneous than it otherwise would have been.  The evidence

6   that a reward had been paid to the citizen-informant was not exculpatory and did not put his

7   statements in a materially different light from the information known to the defense at the time of

8   trial.

9          The citizen-informant had the acumen to discuss a reward for the information he would

10   give the police, and had the presence of mind to plan a meeting with the police to provide his

11   statement.  *See, e.g.,* Docket No. 19-9 at 67 (police notes of interview of sergeant Wingate relate

12   that the informant "gave no personal info. He wanted $"); *id.* at 78 (police notes of interview of

13

---

14   the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of

15   excitement caused by such perception."  Cal. Evid. Code § 1240.  For evidence to be admissible

16   under § 1240, "(1) there must be some occurrence startling enough to produce this nervous

17   excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have

18   been made before there has been time to contrive and misrepresent, i.e., while the nervous

19   excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and

20   (3) the utterance must relate to the circumstance of the occurrence preceding it."  *People v. Poggi*,

21   45 Cal. 3d 306, 318 (Cal. 1988).  In considering the speaker's mental state, the "nature of the

22   utterance--how long it was made after the startling incident and whether the speaker blurted it out,

23   for example--may be important, but solely as an indicator of the mental state of the declarant. The

24   fact that a statement is made in response to questioning is one factor suggesting the answer may be

25   the product of deliberation, but it does not ipso facto deprive the statement of spontaneity."

26   *People v. Farmer*, 47 Cal. 3d 888, 903-04 (Cal. 1989), *abrogated on other grounds by People v.*

27   *Waidla*, 22 Cal. 4th 690 (Cal. 2000); *see, e.g., Farmer*, 47 Cal. 3d at 903-04 (statement made to

28   police dispatcher by wounded crime victim was admissible under spontaneous statement exception

to hearsay rule); *id.* (statements of victim who was bleeding and in great pain to responding police

officer were admissible under spontaneous statement exception); *People v. Pirwani*, 119 Cal. App.

4th 770, 789-90 (Cal. Ct. App. 2004) (holding that admission of evidence as a spontaneous

statement was erroneous where elderly woman who called counselor was "tearful and evidently

quite shaken by the news that she was about to be evicted," but two days elapsed before the

elderly woman met with counselor and made the statement that was being offered as a

spontaneous statement; elderly woman "had two days in which to gather her thoughts, reflect on

them, and regain her composure," and had spoken to police, even if her demeanor at the time of

making the statement in question was "bewildered, confused, distraught and tearful--though not

hysterical--and as 'looking like someone who had received a shock.'").

Roche state: "His main concern was money & animity (sic).  Agreed on $5,000 for info.")   The citizen informant also had the presence of mind to implement his desire to stay anonymous by withholding his name and providing to the police only a cell phone number.  With or without the suppressed evidence, the statement would not have been admitted under the spontaneous statement exception to the hearsay rule because defense counsel would not have been able to convince the trial court that the citizen-informant made his statement while his "reflective powers" were still "in abeyance," *Poggi*, 45 Cal. 3d at 319.

Third, the citizen-informant's statement did not have such indicia of trustworthiness and reliability that due process required its admission.  The Supreme Court has recognized that, when crucial defense "evidence that [bears] persuasive assurances of trustworthiness and is well within the basic rationale of the exceptions for declarations against interest," "the hearsay rule may not be applied mechanistically to defeat the ends of justice."  *Chambers v. Mississippi*, 410 U.S. 284 (1973).[6]  Mr. Mendez's case was not one where the evidence had such persuasive assurances of

_____

[6] In *Chambers*, a third party had confessed to the murder, and later recanted.  Chambers called the third party as a witness; the third party denied responsibility for the murder, and the prosecution established in cross-examination that the third party had recanted his confession.  Unusual and outdated state law evidence rules (that the defendant vouched for the third party because he had called him as a witness) precluded Chambers from effectively questioning or cross-examining the third party to impeach his recantation.  *Chambers*, 410 U.S. at 295-97; *see id.* at 296 (Mississippi's vouching rule has little purpose in modern criminal trials because parties generally must "take [their witnesses] where they find them").  Other evidence of the third party's guilt was excluded because the state's declaration-against-interest exception to the hearsay rule did not apply to declarations against *penal* interests.  *Chambers*, 410 U.S. at 298-300.  The hearsay statements in *Chambers* were made and offered at trial "under circumstances that provided considerable assurance of their reliability," i.e., the confessions mere made spontaneously to a close acquaintance shortly after the murder; each one was corroborated by other evidence, including the third party's sworn confession and testimony of eyewitnesses; each statement was self-incriminatory and unquestionably against the confessor's self interests; and the declarant (i.e., the third party) was in court and could have been cross-examined at Chambers' trial.  *Id.* at 300-01.

It was the combination of the rigid application of the State's evidence rules and the fact that the evidence bore considerable assurances of trustworthiness and reliability that led to the due process violation in *Chambers*.  *See id.* at 302-03.  The Supreme Court specifically pointed out that its holding did not "signal any diminution in the respect traditionally accorded the States in the establishment and implementation of their own criminal trial rules and procedures."  *Id.* at 303.  Here, by contrast, the citizen-informant's statement was inadmissible with a routine application of

**United States District Court**
For the Northern District of California

trustworthiness or was within the basic rationale of an exception to the hearsay rule. The statement lacked sufficient spontaneity to be admissible under the exception to the hearsay rule as discussed in the preceding paragraph. The substance of the statement also raised some questions about its trustworthiness and reliability. There is no indication as to how the citizen-informant managed to see both the shooting and the shooter hide under the house that was 1,235 feet away from where officer McDonald was shot. Assuming *arguendo* that the informant saw someone get out of the car and hide under the house -- a more likely proposition, given that Dye was found hiding under the house -- the informant's ability to observe that event made it less likely that he actually saw officer McDonald get shot 1,235 feet away from it. Not only did the two events take place more than four football fields apart, the evidence regarding the shooting of officer McDonald suggested that any eyewitness would have to be extremely close to the car to be able to discern whether it was the driver or passenger in the front seat who fired the shot that hit officer McDonald. Officer McDonald testified that the shot that hit him was fired from the driver's lap area, and the bullet casings for all four shots were found in the car on the driver's side. These facts would suggest that the gun was held below door level when fired and that the gun was not held outside the car, both of which would have made it difficult for someone in another car or anywhere other than extremely close to the car to see whether it was the passenger or driver who fired the shot. Unlike the situation in *Chambers*, there was not a statement with indicia of trustworthiness and reliability that was excluded by an odd combination of unusual state evidence rules that worked together to defeat the defendant's rights to due process and to present a defense.

Fourth, Mr. Mendez's contention that the suppressed information about the reward and physical description of the informant would have enabled him to find the citizen-informant is utterly unpersuasive. The reward payment would not have provided a lead for defense counsel to look for the citizen-informant because the payment had been made anonymously and did not

---

the hearsay rule and did not have considerable assurances of its reliability such that it fit within the spirit of the hearsay rule or exceptions thereto.

United States District Court
For the Northern District of California

1    contain his name.[7]  The physical description learned from the suppressed materials was that the

2    citizen-informant and the person with him were "5 feet 9 inches to 6 feet tall skinny medium or

3    dark complected black males with shoulder length dreads whose ages were between 17 and the

4    early twenties," and were brothers from the area.  Docket No. 7 at 69.  Searching for the citizen-

5    informant with that information would have been the proverbial search for a needle in a haystack,

6    because hundreds or perhaps thousands of men in the general area might have met that description.

7    Also, the person to be searched for did not want to be found because he feared retaliation.  Recall

8    also that the trial took place two and a half years later, by which time the person's hair style may

9    have changed.  In sum, the search of the haystack would have been for a needle that did not want

10    to be found and may have looked different than when last seen.  Mr. Mendez's assertion that the

11    defense could have found that informant and persuaded him to speak to the defense or to testify

12    had the materials at issue been disclosed to defense counsel is precisely the kind of speculation

13    that courts have determined to be insufficient to satisfy the materiality element of a *Brady* claim.

14    *See, e.g., Wood v. Bartholomew*, 516 U.S. 1 (1995) (Ninth Circuit erred in speculating that defense

15    counsel would have prepared and presented his case differently if he had known about the

16    inadmissible polygraph test results); *Runningeagle v. Ryan*, 686 F.3d 758 (9th Cir. 2012)

17    (although the court can infer from the evidence that the informant "would have implicated"

18    another person, "we have no way of knowing that his testimony would exculpate" defendant; in

19    any event, it would have been testimony from a notoriously unreliable source, a jailhouse

20    informant); *United States v. Abonce-Barrera*, 257 F.3d 959, 970 (9th Cir. 2001) (finding that

21

22    _____

23         [7] During the course of his state habeas proceedings, Mr. Mendez's counsel made inquiries about the reward.  On April 22, 2013, deputy district attorney Kobal wrote to Mr. Mendez's

24    habeas counsel that, in response to counsel's request, she had inquired about documentation of any reward to an anonymous citizen-informant.  She spoke to sergeant Wingate, who believed the

25    informant had been paid but could not recall whether he or another officer took care of the payment.  Further, there was no documentation that would have information identifying the

26    informant because he was an anonymous informant.  Captain Joyner, the lieutenant in charge of the homicide unit in 2007, recalled that the money was given out anonymously, and had checked

27    his files but did not have any paperwork about it.  Sergeant Joyner further stated that, "because the money was given under anonymous conditions, any generated paperwork would simply be a

28    notation of money paid out to an anonymous source."  Docket No. 19-9 at 55.

1   evidence was not material under Brady where the defendant had only "a hunch" that the evidence

2   would be useful).

3          Fifth, had counsel presented evidence at trial that the citizen-informant had received a

4   substantial reward, the jury may have been more suspicious of his statement that he saw the

5   shooting and the shooter hide.  The payment evidence would have raised certain credibility

6   questions for the informant that would not exist if the jury just thought he was doing his civic

7   duty.  "Jurors suspect [informants'] motives from the moment they hear about them in a case, and

8   they frequently disregard their testimony altogether as highly untrustworthy and unreliable."

9   *Banks*, 540 U.S. at 702 (quoting Hon. Stephen H. Trott, *Words of Warning for Prosecutors Using*

10  *Criminals as Witnesses*, 47 Hastings L.J. 1381, 1385 (1996)).

11         Sixth, there is some disagreement among lower courts as to whether inadmissible

12  evidence, such as the citizen-informant's statement, can even be *Brady* material.  The Ninth

13  Circuit has observed that the *Bartholomew* decision, in which the suppressed evidence was

14  inadmissible polygraph evidence, "did not categorically reject the suggestion that inadmissible

15  evidence can be material under *Brady*, if it could have led to the discovery of admissible

16  evidence," *Paradis v. Arave*, 240 F.3d 1169, 1178 (9th Cir. 2001), but also recognized that

17  "[t]here is no uniform approach in the federal courts to the treatment of inadmissible evidence as

18  the basis for *Brady* claims" and even the Ninth "Circuit's law on this issue is not entirely

19  consistent." *Id.* at 1178, 1179.  *Compare Smith v. Baldwin*, 510 F.3d 1127, 1148 (9th Cir. 2007)

20  ("Because they are inadmissible in Oregon courts, the results of Edmonds's polygraph examination

21  do not qualify as 'evidence' for *Brady* purposes, let alone 'material evidence.'  Thus, it is not

22  reasonably probable that the immediate disclosure of the polygraph results would have influenced

23  Smith's decision to plead no contest rather than proceed to trial because Smith 'could have made

24  no mention of them either during argument or while questioning witnesses' or at any other point in

25  the trial"), *with Silva v. Brown*, 416 F.3d 980, 991 (9th Cir. 2005) (rejecting State's argument that

26  the undisclosed deal with a "vital prosecution witness" not to undergo a psychiatric evaluation

27  until after he testified at trial cannot be deemed material under *Brady* because it would have been

28  inadmissible in court; even if the defendant could not have forced a psychiatric evaluation of the

**United States District Court**
For the Northern District of California

witness, "*the fact of the deal itself* would have been admissible to impeach [the witness] by calling into question his capacity as a witness and by illustrating the full extent of the agreement that provided a motive for [him] to testify" thereby undermining his credibility).

The California Supreme Court could have relied on the foregoing reasons to reject Mr. Mendez's *Brady* claim on the ground that he had not shown a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. at 469. Such a decision would not have been contrary to, or an unreasonable application of clearly established federal law as set forth by the U.S. Supreme Court. Mr. Mendez therefore is not entitled to the writ on this claim.

E.      Claims Based On Denial of Request For Continuance

1.      Background

Mr. Mendez argues that the trial court's denial of his mid-trial request for a continuance to obtain witnesses violated his rights to due process and compulsory process. The continuance was sought because several police officers had failed to appear despite the defense's efforts to subpoena them using the procedure established by the Oakland Police Department to subpoena officers. After eight witnesses had testified for the defense, trial counsel informed the court on Thursday (January 28) that he had no more available witnesses, and had been unable to secure the testimony of sergeant Wingate, officer Roche, officer Pope and former officer Jimenez, although he had attempted to subpoena them. Counsel and the court discussed the problems with subpoenaing the officers and an attempt was to be made to get the officers to appear. *See* RT 1001-05. The court ordered the prosecutor to make all reasonable efforts to bring officers Pope and Roche before the court. RT 1003. On the following Monday, defense counsel announced that he had "no witnesses at this time," RT 1006, and asked for a continuance "until we can get these witnesses here. I understand that Officer Roche could be back at the earliest Thursday." RT 1007. The court refused to continue the trial until Thursday (i.e., three days later). Counsel and the court again discussed the problems subpoenaing the officers. Eventually, the court said: "So basically because you don't have any witnesses you're going to have to rest. You've asked for a continuance. I've denied that. We're not waiting until Thursday." RT 1009-10. At the request of

33

defense counsel, the trial court did issue arrest warrants for officers Pope and Roche that day, but the parties later asked the warrant for officer Pope's arrest to be withdrawn because he was on "death leave."

The California Court of Appeal rejected Mr. Mendez's claim that the denial of the continuance violated state law, and "[f]or the same reasons, we also reject Mendez's constitutional claims" *Mendez*, at *14.

> With respect to former officers Jiminez and Wingate, Mendez did not show that either witness's testimony could have been obtained within a reasonable time. Mendez also failed to show that Jiminez's or Wingate's testimony would be material, noncumulative, and could not otherwise be proven. In fact, Mendez's argument with respect to materiality is almost entirely devoid of citation to the record. Mendez's trial counsel even conceded, at the time he moved for a continuance, that "we can do without [Wingate.]" On appeal, Mendez offers nothing but speculation when he argues that Wingate could have established that the informant's out-of-court statement was a spontaneous statement. With respect to Jiminez, we fail to see how he could have added anything to Leonis's testimony regarding Officer McDonald's inability to identify the adult in the missing photograph. And there is no evidence in the record that the photograph in fact showed Mendez. Good cause was not shown for a continuance to obtain either Jiminez's or Wingate's testimony.
>
> With respect to Pope and Roche, it is undisputed that Mendez did properly subpoena the officers through the Oakland Police Department. . . . It is also true that "[o]ur judicial system is grounded on the sanctity of compulsory process, and it operates on the assumption that a subpoenaed witness—whether a police officer or the President of the United States—will either obey an order to appear in court or present his excuses sufficiently in advance of the appearance date...." (*Gaines v. Municipal Court* (1980) 101 Cal.App.3d 556, 560, 161 Cal.Rptr. 704.) Nonetheless, the trial court did not abuse its discretion in denying the motion for a continuance. Mendez has not shown that either Pope or Roche would have said anything materially helpful to his defense.
>
> Mendez made no offer of proof with respect to either officer. The record does show that Pope gave Leonis the wallet-sized photograph of a male adult and a child that was removed from the Camaro. But, Mendez did not assert that Pope would testify that it was Mendez shown in the photograph. Nor was there any showing that Pope would be available to testify within a reasonable period of time. In fact, he was out on an undefined "death leave." With respect to Roche, the record shows that he would have been available "at the earliest" within about three days. The record shows only that Roche was the officer who shot Dye, and there is absolutely nothing in the record to suggest how he would have been able to provide material and noncumulative evidence in this case. Accordingly, we cannot

1    say that the trial court abused its discretion. For the same reasons,
     we also reject Mendez's constitutional claims.

2    *Mendez*, at *13-14.

3        2.    Analysis

4        "The matter of continuance is traditionally within the discretion of the trial judge, and it is

5   not every denial of a request for more time that violates due process even if the party fails to offer

6   evidence or is compelled to defend without counsel.  Contrariwise, a myopic insistence upon

7   expeditiousness in the face of a justifiable request for delay can render the right to defend with

8   counsel an empty formality."  *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) (citations omitted).

9   The Supreme Court explained that there are no "mechanical tests for deciding when a denial of a

10  continuance is so arbitrary as to violate due process.  The answer must be found in the

11  circumstances present in every case, particularly in the reasons presented to the trial judge at the

12  time the request is denied." *Id.*  (citations omitted); *see also Morris v. Slappy*, 461 U.S. 1, 11-12

13  (1983) ("broad discretion must be granted trial courts on matters of continuances; only an

14  unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for

15  delay' violates the right to assistance of counsel").  When a continuance has been denied in

16  violation of the defendant's constitutional rights, habeas relief is not available unless there is a

17  showing of actual prejudice to petitioner's defense resulting from the refusal to grant a

18  continuance.  *See Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997).

19       Mr. Mendez argues also that the denial of a continuance also denied his rights under the

20  Sixth Amendment's Compulsory Process Clause.  He does not, however, identify any Supreme

21  Court case holding that the Compulsory Process Clause is violated by the denial of a midtrial

22  continuance.  The Compulsory Process Clause of the Sixth Amendment preserves the right of a

23  defendant in a criminal trial to have compulsory process for obtaining a favorable witness.  The

24  right to compulsory process is not absolute, however, *see Taylor v. Illinois*, 484 U.S. 400, 410

25  (1988); it may, in appropriate cases, "'bow to accommodate other legitimate interests in the

26  criminal trial process,'" *Rock v. Arkansas*, 483 U.S. 44, 55 (1987), and applies only to testimony

27  that is both material and favorable to the defense.  *See United States v. Valenzuela-Bernal*, 458

28  U.S. 858, 867, 873 (1982); *see, e.g., United States v. Bowman*, 215 F.3d 951, 962-63 (9th Cir.

United States District Court
For the Northern District of California

2000) (no Sixth Amendment violation where exclusion of testimony was not at all critical to the defense; testimony sought would not have exculpated defendant if believed).  The Compulsory Process Clause prevents states from "imped[ing] a defendant's right to put on a defense by imposing mechanistic (*Chambers*) or arbitrary (*Washington* and *Rock*) rules of evidence." *LaGrand v. Stewart*, 133 F.3d 1253, 1266 (9th Cir. 1998).[8]

Mr. Mendez has identified no holding of the Supreme Court that decides whether or when the Compulsory Process Clause may be violated by the denial of a continuance.  It thus appears that *Ungar v. Sarafite* and *Morris v. Slappy* provide the only clear constitutional basis for challenging the denial of the continuance in this case.

The California Court of Appeal's rejection of Mr. Mendez's due process and compulsory process claims was not contrary to or an unreasonable application of clearly established Federal law as determined by the U.S. Supreme Court.  Mr. Mendez's case was not one where the judge had a "myopic insistence upon expeditiousness in the face of a justifiable request for delay." *Ungar*, 376 U.S. at 589.  The requested continuance would have been for three days, which was not an overly lengthy period, but the jurors had already been present for about three weeks since the start of voir dire.  It was uncertain whether even the three-day continuance would result in any witness being secured for trial.  Only one of the witnesses (Roche) might have been available had the trial been continued for three days.  More importantly, defense counsel's description of the reasons for needing the witnesses showed that none would be testifying to anything material that

---

[8] The Supreme Court's Compulsory Process Clause cases have largely been about evidentiary rulings that affect the right to present a defense.  *See, e.g, Rock v. Arkansas*, 483 U.S. at 56-62 (Arkansas' per se rule excluding all hypnotically enhanced testimony was unconstitutional when used to restrict defendant's right to testify); *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) (defendant's right to present a defense was violated by a trial court's blanket exclusion of competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence); *Green v. Georgia*, 442 U.S. 95 (1979) (finding a due process violation in the exclusion of highly relevant and reliable hearsay evidence on a key issue); *Chambers v. Mississippi*, 410 U.S. at 300-03 (defendant was denied a fair trial by a combination of the state's unusual evidentiary rules that prevented him from calling witnesses who would have testified that another witness made trustworthy, inculpatory statements on the night of the crime).

United States District Court

For the Northern District of California

1   was not cumulative, hearsay, or of only marginal relevance.  That same information shows that,

2   even if there was an error in denying the continuance, it was harmless error because the absence of

3   these witnesses did not have a substantial and injurious effect on the jury's verdict.

4          Officer Pope and former officer Jimenez took part in showing to officer McDonald at the

5   hospital a photo of a man with a child that had been found in the abandoned car, and officer

6   McDonald had been unable to identify the man.  But such testimony would have been cumulative

7   of officer Leonis's testimony that she and Pope brought the photo to the hospital, and showed it to

8   officer McDonald, who was unable to identify the man in that photo of a man with a child.  *See*

9   RT 918-21.  Also, there was no indication that officer Jimenez or officer Pope would be able to

10  affirmatively testify that Mr. Mendez was in fact the man in that photograph, which made any

11  potential testimony about Officer McDonald's inability to identify the man in the photo even less

12  useful.  Mr. Mendez's assertion that these officers might "possibly locate the missing photo,"

13  Docket No. 7 at 82, was wholly speculative and did not support a continuance.

14         Defense counsel agreed at trial that he did not need sergeant Wingate as a witness.  On

15  appeal, Mr. Mendez argued that sergeant Wingate could support his argument that the citizen-

16  informant's testimony was a spontaneous statement.  But, as explained earlier in this order, the

17  statement was not a spontaneous statement.  Sergeant Wingate's testimony would not have

18  changed that because his anticipated testimony apparently would have been that the citizen-

19  informant appeared shocked, but also would have shown that the same citizen-informant had the

20  presence of mind to seek a reward, remain anonymous, and make arrangements twice to meet the

21  officers before making the statement to them that he had seen the whole incident.

22         Defense counsel did not describe the anticipated testimony from officer Roche, who had

23  shot Mr. Dye, and did not explain how officer Roche had any material and noncumulative

24  information with regard to the shooting of officer McDonald.  Insofar as Roche was sought to

25  relay the statement of the citizen-informant that the shooter was hiding under the house on Parker

26  Avenue, such testimony would have been hearsay as explained above.

27         The subpoena problems with the police officers are a concern, as one would expect that

28  government agents such as police officers and a police department should be the most respectful

1   of the subpoena power.  It appears that defense counsel tried to subpoena the several officers, but

2   was unable to get subpoenas to one or more of the officers due to the procedures set up by the

3   Oakland Police Department for handling subpoenas of officers.  However, while such problems

4   could jeopardize rights of criminal defendants in other contexts, it is not necessary to examine in-

5   depth the subpoena problems here because the anticipated testimony from those witnesses for

6   whom a continuance was sought was not going to be material.  Mr. Mendez is not entitled to relief

7   on his claim that the denial of the continuance violated his federal constitutional rights.  The

8   California Court of Appeal's rejection of Mr. Mendez's claim was not an unreasonable application

9   of, or contrary to, clearly established federal law as set forth by the U.S. Supreme Court.

10   F.    <u>Ineffective Assistance of Counsel Claims</u>

11        Mr. Mendez asserts several ineffective assistance of counsel claims.  Most of his

12   ineffective assistance of counsel claims relate to the foregoing claims that the citizen-informant's

13   statement should have been admitted and that sergeant Jones' false testimony should not have

14   been tolerated.  Mr. Mendez also asserts that counsel failed to present motive evidence for Mr.

15   Dye, despite having indicated in his opening statement that he would do so.  Mr. Mendez's

16   ineffective assistance of counsel claims were denied summarily by the California Supreme Court.[9]

17        The Sixth Amendment's right to counsel guarantees not only assistance, but effective

18   assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for

19   judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

20   functioning of the adversarial process that the trial cannot be relied upon as having produced a just

21   result.  *Id.*  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner

22

23        [9] Mr. Mendez did present an ineffective assistance of counsel claim on direct appeal based

24   on counsel's failure to present motive evidence for Mr. Dye.  The claim was rejected by the
California Court of Appeal, which hypothesized reasons for counsel's actions.  *See Mendez*, at

25   *14.  Mr. Mendez thereafter added trial counsel's declaration regarding his decision-making and
presented the revised claim to the California Supreme Court.  The California Supreme Court had

26   before it evidence in the habeas petition that had not been presented to the California Court of
Appeal on direct appeal.  Therefore, because the evidence presented to the California Supreme

27   Court was a more complete picture than was earlier presented to the California Court of Appeal,
this Court looking at the California Supreme Court's unexplained denial, rather than the California

28   Court of Appeal's earlier reasoned decision, in applying § 2254(d).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

must establish two things.  First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id.* at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*  The relevant inquiry under *Strickland* is not what defense counsel could have done, but rather whether his choices were reasonable.  *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.  *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011).  The "question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

1.     Sergeant Jones' Testimony and the Informant's Statement

Mr. Mendez contends that counsel was ineffective in failing to argue that sergeant Jones' knowledge of the confidential informant's statement to police was admissible to impeach sergeant Jones' testimony; failing to impeach sergeant Jones' testimony that he had ruled out other suspects with the confidential informant's statement; failing to argue that the redacted statement of sergeant Jones on the video recording was admissible to impeach his testimony that he had received no other leads and had ruled out other suspects; failing to offer the confidential informant's statement as admissible under the spontaneous statement exception to the hearsay rule and as so trustworthy that due process required its admission; failing to argue at trial that the prosecution had committed a *Napue* violation; failing to object to the prosecutor's questions that elicited the answers violative of *Napue* and to the court's question to sergeant Jones whether he had ruled out the passenger as a possible shooter as asking for opinion evidence; and failing to investigate the materials he did receive so that he could uncover the evidence that is the subject of the *Brady* claim.

The rejection of Mr. Mendez's ineffective assistance of counsel claims by the California Supreme Court was not contrary to or an unreasonable application of *Strickland*.  The California

**United States District Court**
For the Northern District of California

Supreme Court reasonably could have concluded that any failing of counsel to adequately assert the Confrontation Clause, Compulsory Process Clause, and Due Process Clause arguments (including the *Napue* and *Brady* claims) was not deficient performance because, as explained in the preceding sections of this order, those claims are not meritorious.  *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (counsel's performance not deficient for failing to raise meritless objection); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take a futile action can never be deficient performance).  The California Supreme Court reasonably could have concluded that counsel did not engage in deficient performance by not making further arguments that the citizen-informant's statement was admissible as a spontaneous statement or because it was so trustworthy that due process required its admission for the same reasons discussed in section B.2, as well as footnote 6 and accompanying text, above.

The California Supreme Court also reasonably could have determined that, even if counsel engaged in deficient performance in the manner alleged with regard to sergeant Jones' testimony and the informant's statement, Mr. Mendez failed to satisfy the prejudice prong of *Strickland*.  That court could have concluded that the ineffective assistance claim failed on the prejudice prong because the arguments would have failed, even if made.  Alternatively, that court could have concluded that there was no reasonable probability of a different outcome if the trial court had admitted the confidential informant's statement (whether for the truth of the matter or as impeachment), sergeant Jones' false statement had been corrected, and the court had excluded the alleged opinion testimony that there were no other suspects and the passenger had been ruled out as a suspect.  The informant's statement had the problems mentioned earlier (i.e., the information had been given in exchange for a reward and there were doubts about his ability to see both the shooting and the shooter hiding under the house far away) that would have been pointed out by the prosecutor.  Sergeant Jones had not witnessed the shooting and was merely summarizing the evidence collected.  There also was "strong direct and circumstantial evidence that Mendez was the shooter."  *Mendez*, at \*10.  Officer McDonald was certain that he was shot by the driver, had seen the driver raise his arm with the gun in it after the first two shots, and was firm in his identification of Mr. Mendez as both the driver and the shooter.  Mr. Mendez had not testified or

**United States District Court**
For the Northern District of California

1   presented other direct evidence that Mr. Dye was the shooter, and the defense asked the jury to

2   speculate from various circumstances that Mr. Dye was the shooter.  Further, evidence *was*

3   admitted that Mr. Dye was a suspect in the shooting and had been shot under the house on Parker

4   Avenue.  And defense counsel argued that the citizen-informant saw the shooting and saw the

5   shooter hide under the house on Parker Avenue.

6       2.    <u>Motive Evidence</u>

7         In his opening statement, defense counsel stated that Mr. Dye was also in the car and "had

8   some issues of his own.  He has more of a record than Mr. Mendez to the extent that he was on

9   parole."  RT 68.  Mr. Mendez argues that counsel was ineffective in failing to offer the evidence

10  counsel "promised" in his opening statement.  Docket No. 7 at 65  At the time of the shooting, Mr.

11  Dye was on probation with a standard condition of probation that he had to submit to a search by

12  any "law enforcement officer at any time of the day or night with or without a search warrant,

13  including: vehicle, residence, person or any other property under your control."  Docket No. 19-9

14  at 83.  Mr. Mendez argues that this evidence "would have provided a motive for Dye to shoot

15  McDonald rather than be found with a gun during a probation search" and go to prison for a

16  lengthy term.  Docket No. 7 at 66.  The prosecutor argued that Mr. Mendez had such a motive

17  because he was a felon in possession of a gun.  Mr. Mendez also argues that counsel was

18  ineffective in failing to present evidence that in 2003, when police pulled over a car to arrest Dye

19  for a robbery, Dye had fled from the front passenger seat and tried to hide to avoid arrest.

20        The California Supreme Court reasonably could have rejected this ineffective assistance of

21  counsel claim on the prejudice prong of *Strickland*  That court could have concluded that there

22  was no reasonable probability of a different outcome if the motive evidence had been presented.

23  The motive evidence was quite weak.  Mr. Mendez has not shown that probationers who are just

24  passengers in cars that commit moving violations are always or regularly searched, so he would

25  have been asking the jury to believe that the possibility of a search was so worrisome that a

26  probationer with a gun would shoot a police officer who has indicated nothing more afoot than a

27  traffic stop.  And if the motive evidence was pursued, it would have put more focus on the only

28  gun that was found.  That gun, found in the area where Mr. Dye had fled and possibly dropped by

**United States District Court**
For the Northern District of California

1   him as he tried to hide, was not the weapon that fired the shots that hit officer McDonald; this

2   would have supported the view that Mr. Dye was not the shooter.  The evidence that Mr. Dye had

3   fled from an officer three years earlier was of minimal probative value with regard to motive or

4   determining the identity of Officer McDonald's assailant.  Further, as mentioned above, there was

5   "strong direct and circumstantial evidence that Mr. Mendez was the shooter." *Mendez*, at *10.

6   The jury also had heard evidence that Mr. Dye was a suspect, and the parties were in agreement

7   that he fled from the police after officer McDonald was shot.

8       Applying the "'highly deferential' look at counsel's performance . . . through § 2254(d)'s

9   'deferential lens,'" *Pinholster*, 563 U.S. at 190, it cannot be said that the California Supreme

10   Court's rejection of Mr. Mendez's ineffective assistance of counsel claims was contrary to or an

11   unreasonable application of *Strickland*.  Mr. Mendez is not entitled to the writ on his ineffective

12   assistance of counsel claims.

13   G.   A Certificate of Appealability Will Not Issue

14       Mr. Mendez has not "made a substantial showing of the denial of a constitutional right," 28

15   U.S.C. § 2253(c)(2), and this is not a case in which "reasonable jurists would find the district

16   court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S.

17   473, 484 (2000).  Accordingly, a certificate of appealability is **DENIED**.

### VI.   CONCLUSION

19       Petitioner has requested appointment of counsel to represent him in this action.  A district

20   court may appoint counsel to represent a habeas petitioner whenever "the court determines that the

21   interests of justice so require" and such person is financially unable to obtain representation.  18

22   U.S.C. § 3006A(a)(2)(B).  The decision to appoint counsel is within the discretion of the district

23   court. *See Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986).  Appointment is mandatory only

24   when the circumstances of a particular case indicate that appointed counsel is necessary to prevent

25   due process violations. *See id.*  The interests of justice do not require appointment of counsel in

26   this action.  The request for appointment of counsel is **DENIED**.  Docket No. 28.

27   ///

28   ///

United States District Court
For the Northern District of California

1    The petition for writ of habeas corpus is **DENIED** on the merits.  Mr. Mendez's motion for

2  an evidentiary hearing is **DENIED**.  Docket No. 27.  The Clerk shall close the file.

3

4    **IT IS SO ORDERED**.

5

6  Dated: December 21, 2015

7  _____

8  EDWARD M. CHEN
   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28